# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                               No. CR 15-2485 JB

KEVIN FOLSE,

     Defendant.

## MEMORANDUM ORDER AND OPINION

**THIS MATTER** comes before the Court on Defendant Kevin Folse's Motion for a New Trial, filed June 5, 2017 (Doc. 228)("Motion"). The Court held hearings on August 1, 2017, and September 18, 2017. The primary issue is whether the Court should grant Defendant Kevin Folse post-trial discovery, because, after the trial, Folse discovered an affidavit, from a prior Inspection of Public Records Act, N.M. Stat. Ann. §§ 14-2-1, et seq. ("IPRA"), manager at the Albuquerque, New Mexico Police Department ("APD"), Reynaldo Chavez, alleging that APD practiced altering lapel camera video evidence, and Chavez made the same allegations in the September 18, 2017, hearing. The Court will deny the Motion, because, given Chavez' testimony at the hearing, Folse has presented no new evidence that was unexplored at trial.

## FACTUAL BACKGROUND

The Court recited this case's facts and early procedural history in its Memorandum Opinion and Order at 2-7, 301 F. Supp. 3d 1037, 1041-46, filed October 5, 2017 (Doc. 247)("MOO"). The Court incorporates that recitation here.

> The Court takes its factual account from the Presentence Investigation Report, filed May 10, 2017 (Doc. 220)("PSR"). . . .
>
> Between June 30 and July 2, 2015, [APD] detectives searched for Folse, a.k.a. "Criminal," who was fleeing from law enforcement and had "committed

various violent crimes" during flight.  PSR ¶ 5, at 4.  On July 2, 2015, APD officers stopped a stolen black Cadillac . . . .  PSR ¶ 6, at 4.  Although the officers determined that Folse was not the driver, the driver stated that he had just purchased the vehicle from Folse and that Folse was located at 1825 Pitt Street NE in Albuquerque, New Mexico.  See PSR ¶ 6, at 4.  APD dispatched officers to the residence, . . . .  See PSR ¶ 7, at 4.  The officers failed, however, to positively identify the man.  See PSR ¶ 7, at 4.  An APD detective then proceeded to the back of the residence and observed an individual -- later identified as Valente Estrada -- looking out the back window.  See PSR ¶ 7, at 4.  Estrada said the front door was "barricaded" and that he was alone in the residence.  PSR ¶ 8, at 5.

Shortly thereafter, the man first observed at the front door -- later identified as Folse -- "had [Estrada] join four other individuals in the bedroom with Angela Murray," Folse's girlfriend,[1] where Folse "proceeded to take all of their cellular telephones and remove[] their batteries . . . ."  PSR ¶ 8, at 5.  Estrada "observed that Folse had both a knife and a handgun in his possession."  PSR ¶ 8, at 5.  To help "ease the tension," Estrada offered Folse and the others marijuana and methamphetamine.  PSR ¶ 9, at 5.  After consuming the methamphetamine, Folse threatened to stab one of the individuals and to hold "everyone in the room at gunpoint for seven hours."[2]  PSR ¶ 9, at 5.  Tensions were high, because Murray had challenged Folse to prove that he had not "been with any of the women in the house[.]"  PSR ¶ 10, at 5.  In response to this challenge, Folse "pulled out his gun and started pistol-whipping one of the females in the home."  PSR ¶ 10, at 5.

Folse eventually decided to leave the residence, but, before leaving, Folse ordered Estrada to hand over the keys to his 2002 silver Saturn passenger vehicle.  See PSR ¶ 11, at 5.  Estrada complied with Folse's order, fearing that he "had no choice . . . based on the continuous threats and acts of violence against him."  PSR ¶ 11, at 5.  Folse and Murray then exited the house, and ordered Estrada and one of Murray's female friends into the Saturn.  See PSR ¶ 11, at 5.  Estrada and the friend "did not feel they had a choice but to go with Folse . . . ."  PSR ¶ 11, at 5.

APD received information that Folse had departed the house in a silver Saturn.  See PSR ¶ 12, at 5.  Officers soon caught up to the Saturn and attempted to conduct a traffic stop . . . .  See PSR ¶ 12, at 5.  . . .  [T]he vehicle . . . "crashed

---

[1]Murray was initially a co-Defendant in this matter.  See Superseding Indictment ¶ 2, at 2, filed September 10, 2015 (Doc. 31)("Superseding Indictment").  The Court severed the two matters on September 29, 2015.  See Order Granting Defendant Kevin Folse's Motion to Sever Defendants, filed September 29, 2015 (Doc. 72).

[2]The PSR acknowledges that "[t]estimony at trial did not explain what happened inside the residence at Pitt prior to [Estrada] coming home[,] or why Folse was holding three persons at gunpoint inside the home."  PSR ¶ 9, at 6.

violently, rolling the car onto its roof." PSR ¶ 13, at 6. As APD arrived on the scene, "the vehicle was still spinning and four individuals emerged from the broken windows." PSR ¶ 13, at 6.

Folse and Murray fled on foot. See PSR ¶ 13, at 6. As they entered a residential street, they came upon a 2008 Kia Sorrento sitting in a driveway with the engine running. See PSR ¶ 14, at 6. Folse opened the driver-side door and told Michael B., a juvenile sitting in the passenger seat, that he had "three seconds to get out." PSR ¶ 14, at 6. Michael B. complied with Folse's order, but as Michael B. was exiting the car, Folse backed the car out of the driveway and clipped Michael B.'s left shoulder with the open car door. See PSR ¶ 14, at 6; id. ¶ 16, at 6. In an interview and later at trial, Michael B. testified that Folse had a firearm; immediately after the incident, however, he told a 911 operator that Folse did not have a firearm. See PSR ¶ 14, at 6; id. ¶ 16, at 6.

APD officers later located the Kia Sorrento and recognized Folse as the driver. See PSR ¶ 15, at 6. When the officers attempted another vehicle stop, Folse again failed to yield. See PSR ¶ 15, at 6. "A vehicle pursuit ensued, but was discontinued due to the reckless driving by Folse." PSR ¶ 15, at 6. Folse eventually abandoned the Kia Sorrento on Interstate 40, hopped the freeway retaining wall, and "ran towards a business complex where he was able to get a ride out of the area." PSR ¶ 15, at 6.

The next day, on July 3, 2015, APD located Folse at a Seven-Eleven store in Albuquerque. See PSR ¶ 17, at 6. When officers attempted to arrest Folse, he fled the scene in a stolen 1999 Ford F-150 truck.[3] See PSR ¶ 17, at 6. A vehicle pursuit again ensued, but "officers disengaged from the chase because Folse was putting the public at risk of being harmed." PSR ¶ 17, at 6. Later that day, Isleta Pueblo Police Department officers observed the Ford F-150 truck parked at the Isleta Casino outside Albuquerque. See PSR ¶ 17, at 6. After reviewing security tapes, officers confirmed that Folse was in the Casino. See PSR ¶ 17, at 6. When Folse exited Isleta Casino, officers arrested him without incident. See PSR ¶ 17, at 6. The keys to the stolen F-150 were in his pocket. See PSR ¶ 17, at 6.

In September 2015, Folse wrote a letter to a friend known as "Creeper," asking him "to do what he could in assuring that [Estrada] would not show up to testify." PSR ¶ 18, at 6. "The letter was given to [Estrada] who then gave it to law enforcement." PSR ¶ 18, at 6-7.

---

[3]The PSR, in its discussion of "Offense Behavior Not Part of Relevant Conduct," states that Folse stole the F-150 on July 1, 2015, while the vehicle's owner was inside a convenience store. PSR ¶ 52, at 10. The owner had left the keys in the ignition and the engine running. See PSR ¶ 52, at 10. The next day, on July 2, 2015, Folse was observed driving the F-150. See PSR ¶ 52, at 10.

MOO at 2-5, 301 F. Supp. 3d at 1043-46.

## PROCEDURAL BACKGROUND

On July 14, 2015, a grand jury indicted Folse for: (i) being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Count I); (ii) carjacking a silver Saturn, in violation of 18 U.S.C. § 2119 (Count II); and (iii) using, carrying, and brandishing a firearm in relation to and in furtherance of a crime of violence, i.e., carjacking the Saturn, in violation of 18 U.S.C. § 924(c) (Count III). See Indictment at 1-2, filed July 14, 2015 (Doc. 10)("Indictment"). On September 9, 2015, a grand jury returned a Superseding Indictment. See Superseding Indictment 1, filed September 10, 2015 (Doc. 31)("Superseding Indictment"). The Superseding Indictment preserves the original Indictment's three counts and adds two new counts. Count IV charges Folse with carjacking a 2008 Kia Sorrento, in violation of 18 U.S.C. § 2119, see Superseding Indictment ¶ 4, at 3, and Count V charges Folse with using, carrying, and brandishing a firearm in relation to and in furtherance of a crime of violence, i.e., carjacking the Kia Sorrento, in violation of 18 U.S.C. § 924(c), see Superseding Indictment ¶ 5, at 3. Plaintiff United States of America later dismissed Count V, because it obtained evidence that Folse did not use a firearm in the second alleged carjacking. See United States' Unopposed Motion to Dismiss Count Five of the Superseding Indictment ¶¶ 5-9, at 3, filed October 1, 2015 (Doc. 83). On October 8, 2015, following a three-day trial, a jury convicted Folse on all four remaining counts. See Verdict at 1, filed October 8, 2015 (Doc. 105).

MOO at 5-7, 301 F. Supp. 3d at 1041-43.

On cross-examination at the trial, Folse questioned the APD officers who were pursuing Folse when he entered the Kia Sorrento, APD Detective Deloris Sanchez and APD Detective Ronald Clipp, twice about their lapel cameras. See Motion at 3; Transcript of Hearing at 5:19-22 (taken September 18, 2017), filed October 4, 2017 (Doc. 246)(Sanchez)("Sept. 18 Tr."); Transcript of Trial Proceedings at 112:19-114:3 (taken October 5, 2015), filed December 3, 2015 (Doc. 121)(Villa, Sanchez)("Oct. 5 Tr."); id. at 126:6-23 (Villa, Sanchez); Transcript of Trial Proceedings at 377:18-378:22 (taken October 6, 2015), filed December 3, 2015 (Doc. 122)(Villa, Clipp)("Oct. 6 Tr."); id. at 464:1-22 (Villa, Clipp). Folse began examining Sanchez on the question:

Villa: Did you have a lapel video?

Sanchez: I would have, but it was not working at the moment because it was dead -- the battery on it was dead.

Villa: Okay. Where was your -- where do you keep your lapel video?

Sanchez: On my vest, right in the center.

Villa: What is a lapel video?

Sanchez: It's a small body camera that we wear.

Villa: Are there any policies within the department about wearing those videos?

Sanchez: Yes, sir.

Villa: What are those?

Sanchez: We're obligated to wear them on certain calls, basically, with public contact.

Villa: Any public contact?

Sanchez: For the most part, yes, sir.

. . . .

Villa: What kind of battery does the video use?

Sanchez: It has an internal battery. The way I always use it is you plug it to charge it in -- or you plug it in to charge it, sorry. So I have a cord at my desk that I plug it into, and it recharges.

Villa: Do you use a backup battery or anything like that?

Sanchez: Not that I'm aware of.

Villa: Do you remember when it died?

Sanchez: Not specifically. But it was a long time before this, before the vehicle incident.

Villa: Before you got to the Pitt house or after?

Sanchez: I would have to refer to the last video I have of that.

Oct. 5 Tr. at 112:19-114:3 (Villa, Sanchez).  Folse continued later:

> Villa: You indicated earlier that -- I believe you said your lapel video battery was dead.  Do you know why it was dead?
>
> Sanchez: Like I said before, it was a very long night.  Everything I had on me had died: [m]y radio, both of my cell phones.
>
> Villa: You didn't have backup batteries on you or near you?
>
> Sanchez: No.
>
> Villa: Do you know if the batteries of either of the officers' videos cameras also went dead?
>
> Sanchez: I know my teammates basically had similar things happen.  I can't tell you specifically what of theirs went dead.  But yeah, we were pretty much running on a skeleton crew at that moment.
>
> Villa: And again, that's because you had been out there for such a long period of time?
>
> Sanchez: Yeah.

Oct. 5 Tr. at 126:6-23 (Villa, Sanchez).  The next day, Folse turned to Clipp, asking him about his lapel camera:

> Villa: And Officer, you also had a lapel camera during this time?
>
> Clipp: Yes.
>
> Villa: Can you tell me when you activated that lapel camera?
>
> Clipp: I activated it during -- once we got to the crash -- or actually it was after I came back from pursuing Mr. Folse on foot.
>
> Villa: So you didn't activate it until after you saw Mr. Folse leave in the Kia and came back to the Saturn?
>
> Clipp: Correct.
>
> Villa: Why not?

Clipp: We had been conducting this tactical operation plan since 9:00 the previous night. The battery on my camera was going dead. I had recorded a long period of time while we were at the 1825 Pitt residence. I believe once I -- I believe that it was dead. Then, once I went back to the crash scene, after pursuing Mr. Folse on foot, I just attempted to activate it, and it did run for a short period of time. But that was all the battery life that it had.

Villa: So there is no lapel camera that would capture any part of you chasing Mr. Folse or watching him go off in the Kia, anything like that?

Clipp: No, there is not.

Villa: But you did activate it once you got back and began dealing with Mr. Estrada and the person who claims she was Stephanie Stawicki?

Clipp: Yes.

Oct. 6 Tr. at 377:18-378:22 (Villa, Clipp). Folse returned to the subject later:

Villa: And if I remember your testimony from before, you didn't have any lapel camera running when you and Detective Sanchez contacted Michael B. and his relatives at the house?

Clipp: No.

Villa: Are you aware whether Detective Sanchez has any lapel video of the contact she had with Michael B.?

Clipp: I know she doesn't have lapel video. Her camera was dead as well, just like mine. I don't recall if she had an audio recording of that interview or not.

Villa: But your camera wasn't totally dead; right? Because if I remember the sequence of events, didn't you go back to Mr. Estrada, and the woman who claimed she was Stephanie Stawicki, after you saw what happened with the Kia?

Clipp: Yes.

Villa: Okay. And your camera worked at least for a little while?

Clipp: Correct. But it was dead after that.

Villa: Okay.

Oct. 6 Tr. at 464:1-22 (Villa, Clipp).

1. **The Motion.**

On June 5, 2017, Folse filed the Motion, requesting a new trial under rule 33 of the Federal Rules of Criminal Procedure, or, alternatively, further discovery and an evidentiary hearing. See Motion at 1. According to Folse, in October, 2016, Reynaldo Chavez, former Records Custodian and IPRA Supervisor for APD, swore in an affidavit in Hawkes v. City of Albuquerque, No. D-202-CV-2016-01373 (Second Judicial District Court, County of Bernalillo, State of New Mexico), that he had withheld, obstructed, concealed, or destroyed records at APD's request. See Motion at 1-2 (citing Hawkes v. City of Albuquerque, No. D-202-CV-2016-01373, Affidavit of Reynaldo Chavez ¶¶ 14, 16, at 3 (dated October 28, 2016), filed June 5, 2017 (Doc. 228-1)("Chavez Aff."); id. ¶ 19, at 4). Chavez, Folse notes, states that individuals could easily alter APD lapel camera videos by "blurring" or adding images, Motion at 2 (quoting Chavez Aff. ¶¶ 28-29, at 6; id. ¶ 31, at 7); according to Folse, based on the Chavez Aff., APD trained officers to "edit, delete, blur, or corrupt the lapel videos," and directed officers in "specialized units" not to write incident reports until APD reviewed related videos, Motion at 2 (citing Chavez Aff. ¶ 34, at 7). In the Chavez Aff., Chavez alleges that "political calculations motivated City employees to commit . . . unlawful or improper actions," like concealing evidence showing APD misconduct. Chavez Aff. ¶ 20, at 5. For instance, he accuses Frank Pezzano, an employee in the Criminal Forensic Unit, of encrypting or erasing lapel videos, see Chavez Aff. ¶ 21, at 5, Lieutenant Aragon of allowing Pezzano's actions, see Chavez Aff. ¶ 22, at 5, and Detective Christopher B. Whigham of training individuals to edit lapel videos, see Chavez Aff. ¶ 30, at 6.

Folse indicates that, also in Hawkes v. City of Albuquerque, Kevin Angell, "an expert experienced in law enforcement, metadata examination, and audio and video body-worn camera

media review," Motion at 2 (citing <u>Hawkes v. City of Albuquerque</u>, No. D-202-CV-2016-01373, Affidavit of Kevin Angell ¶¶ 1, 3, 4, at 1-2 (dated May 2, 2017), filed June 5, 2017 (Doc. 228-2)("Angell Aff.")), alleges that APD altered lapel video relevant to that case, <u>see</u> Motion at 2 (citing Angell Aff. ¶ 7, at 2; <u>id.</u> ¶¶ 15, 17, at 3).  Folse avers that the attention his case garnered[4] and the recent revelations about APD's lapel videos raise concern about the lapel video evidence in his case.  <u>See</u> Motion at 3.

Folse continues, arguing that such concern is particularly poignant, because Sanchez and Clipp testified that their lapel cameras did not record his and their encounter, because the long hours on his shift depleted the lapel cameras' batteries.  <u>See</u> Motion at 5-6 (citing Oct. 5 Tr. at 112:19-24 (Villa and Sanchez); <u>id.</u> at 113:19-114:9 (Villa and Sanchez); <u>id.</u> at 126:6-14 (Villa and Sanchez); Oct. 6 Tr. at 377:221-378:04 (Villa and Clipp); <u>id.</u> at 378:04-08 (Villa and Clip); <u>id.</u> at 378:10-22 (Villa and Clipp)).  First, Folse theorizes that, because any USB adapter could recharge the lapel cameras, and, because Sanchez and Clipp sat in their car for four and a half hours before encountering Folse, their lapel cameras, contrary to their trial testimony and pursuant to APD's policy, should have been charged.  <u>See</u> Motion at 7.    Second, Folse questions why the United States and APD did not release to him the original lapel videos.  <u>See</u> Motion at 7-8.  Folse explains

---

[4]<u>See</u>, <u>e.g.</u>, Shelby Perea, <u>Carjacker Behind Bars, Grandmother Still Fearful</u>, KRQE (July 6, 2015), https://www.krqe.com/news/crime/carjacker-behind-bars-grandmother-still-fearful/1019629525; Maggie Shepard, <u>Carjacker Who Evaded Police Gets 30 Years</u>, Albuquerque Journal (March 21, 2018), https://www.abqjournal.com/1148969/carjacker-who-evaded-police-gets-30-years.html; <u>Kevin Folse Arrested Recently</u>, KOAT7 (July 6, 2015), https://www.koat.com/article/kevin-folse-arrested-recently/4477072; <u>Man who Carjacked Teen Sentenced to 30 Years in Prison</u>, KRQE (March 21, 2018), https://www.krqe.com/news/news-briefs/man-who-carjacked-teen-sentenced-to-30-years-in-prison/1067044768; <u>Two-day Crime Spree Leads to 30-year Sentence for Man</u>, KOB4 (March 22, 2018), https://www.kob.com/albuquerque-news/two-day-crime-spree--30-year-sentence-kevin-folse/4835517/.

that he recently requested from APD evidence related to Sanchez' and Clipp's surveillance equipment, and the APD Records Custodian denied that APD possessed such material, and stated that Sanchez and Clipp were not on service during that time. Motion at 8-9 (quoting Email from Amy L. Thompson to Gretchen Byrne at 1 (sent February 22, 2017), filed June 5, 2017 (Doc. 228-14)). Folse explains that, after Folse insisted to APD that Sanchez and Clipp testified to serving on duty during that time, APD provided some documentation, but admitted to "redact[ing] or exempt[ing]" information, without identifying the information withheld. Motion at 9 (citing Email from Amy L. Thompson to Gretchen Byrne at 1 (sent March 7, 2017), filed June 5, 2017 (Doc. 228-16)). Folse complains that APD did not produce evidence that allows Folse to identify changes made to the lapel videos. See Motion at 9. According to Folse, the lapel videos' original content is important, because Sanchez and Clipp displayed "unexplained personal animus for Mr. Folse." Motion at 9.

Folse avers that "the original video evidence is also necessary given contradictory testimony at trial," Motion at 11, and cites as conflicting testimony: (i) Clipp could see Folse enter the Kia Sorrento, but Clipp did not see someone exit or stand near the vehicle, see Motion at 11 (citing Oct. 6 Tr. at 354:16-25 (Clipp); id. at 355:10-11 (Clipp)), and (ii) Clipp could not say whether Folse had a firearm but implausibly stated that Clipp could read Folse's tattoo, see Motion at 12 (citing Oct. 6 Tr. at 394:08-17 (Pflugrath, Michael B.); id. at 399:15-400:04 (Pflugrath, Michael B.); id. at 413:11-19 (Pflugrath, Michael B.); id. at 419:13-19 (Pflugrath, Michael B.)) Folse argues that, given the factual background recited, by failing to learn whether APD altered the lapel videos, the United States violated Brady v. Maryland, 373 U.S. 83 (1963)("Brady"), because evidence of tampering would be favorable to Folse, material to his case, and not known

to him until he discovered the affidavit in <u>Hawkes v. City of Albuquerque</u>. <u>See</u> Motion at 13-15. Folse further identifies <u>California v. Trombetta</u>, 439 F.3d 670, 699 (10th Cir. 2006), as precedent requiring a new trial if the United States altered the lapel videos, because, again, evidence of such modifications would be favorable to Folse and material to the case, and Folse could not have previously obtained it. <u>See</u> Motion at 15-16. Finally, Folse indicates that he cannot determine whether <u>United States v. Sinclair</u>, 109 F.3d 1257 (10th Cir. 1997), which provides the test for new trials based on newly discovered evidence, applies, because he cannot access, and thus cannot analyze, potential evidence. <u>See</u> Motion at 16. In summary, Folse avers that, if doubts exist about the lapel videos' veracity, Folse lacks confidence in the evidence submitted at trial. <u>See</u> Motion at 17.

**2.      The Response.**

The United States first clarifies that <u>Arizona v. Youngblood</u>, 488 U.S. 51 (1988) -- not <u>California v. Trombetta</u> -- provides the test for granting a new trial when the United States destroys "potentially useful evidence" and that, to satisfy the <u>Arizona v. Youngblood</u> test, a defendant must show that the United States destroyed evidence in bad faith. <u>See</u> United States' Response to Kevin Folse's Motion for a New Trial at 5-6, filed June 16, 2017 (Doc. 232)("Response")(citing <u>Arizona v. Youngblood</u>, 488 U.S. at 58). Further, the United States notes that it did not destroy evidence, because no additional lapel videos existed. <u>See</u> Response at 9. Second, the United States responds to Folse's <u>Brady</u> claims by noting that Folse leaps from APD's policy requiring officers to use lapel cameras to the conclusion that the lapel videos for Sanchez' and Clipp's encounter with Folse exist, and Folse proffers no evidence illustrating that APD altered Sanchez' and Clipp's lapel videos. <u>See</u> Response at 6-7. The Chavez Aff. and the Angell Aff., the United States notes, do

not mention lapel videos showing Folse, and Sanchez and Clipp explained that their lapel camera batteries died.  See Response at 7.  Further, according to the United States, Folse cannot establish, as Brady requires, that Sanchez' and Clipp's lapel video would be material to and favorable to his case, because the United States established, through Michael B. and his grandmother's testimony, that Michael B. was in the Kia Sorrento when Folse entered it, and nothing illustrates that the jury found the witnesses incredible.  See Response at 8.  Fourth, in a footnote, the United States indicates that United States v. Sinclair is not relevant, because United States v. Sinclair does not apply where Brady applies.  See Response at 4 n.1 (citing United States v. Torres, 569 F.3d 1277, 1282 (10th Cir. 2009)).  Finally, the United States avers that, because sworn testimony reflects that the United States possesses no additional evidence, Folse cannot meet the standard required to warrant an evidentiary hearing; according to the United States, Folse cannot show that "admissible evidence presented by the petitioner, if accepted as true, would warrant relief as a matter of law." Response at 9 (quoting United States v. Velarde, 485 F.3d 553, 559 (10th Cir. 2007)).

    **3.**    **The Reply.**

On June 30, 2017, Folse replied to the United States.  See Defendant Kevin Folse's Reply in Support of His Motion for a New Trial, filed June 30, 2017 (Doc. 234)("Reply").  According to Folse, the available evidence is consistent with the possibility that APD practices altering or destroying evidence.  See Reply at 2.  Folse clarifies that he does not seek to apply United States v. Sinclair to the case; in the Motion, he mentioned the doctrine as an alternative basis for a new trial.  See Reply at 3.  Further, Folse reiterates that APD admitted that it has evidence, which it refuses to produce, about Sanchez' and Clipp's lapel cameras, and repeats his doubts that no lapel videos exist, because, by not recording the encounter with Folse, Sanchez and Clipp violated APD

policy, and APD practiced altering lapel videos.  See Motion at 3-5.  According to Folse, evidence

from lapel videos could establish whether Folse was in or next to the Kia when it was taken.  See

Motion at 5.  Disputing the United States' claims regarding California v. Trombetta and Arizona

v. Youngblood, Folse repeats that APD has refused to produce evidence.  See Reply at 5-6.  Finally,

Folse requests that, given the allegations that APD altered evidence, the Court re-open discovery.

See Reply at 6.

### 4.    The August 1, 2017, Hearing.

The Court began the hearing by asking whether the Court and the parties could work

together, for instance, by agreeing to subpoena APD, to obtain information about the lapel videos

related to Folse's case, because the Chavez Aff. raised concerns about what actions APD had taken

in handling the lapel videos.  See Draft Transcript of Hearing at 5:9-6:2 (taken August 1,

2017)(Court)("Aug. 1 Tr.").[5]  The Court stated: "I think we're a long ways right at the moment

from grant[ing a] new trial or finding any sort of Brady violations . . . ."  Aug. 1 Tr. at 6:3-9

(Court).  Folse agreed with the Court that the case was in a "discovery posture," like the posture

of the case in United States v. Velarde.  Aug. 1 Tr. at 7:1-2 (Sanchez).  The Court asked for

clarification whether United States v. Velarde "was where they allowed some post trial discovery,"

Aug. 1 Tr. at 7:4-5 (Court), and "compared [the post-trial discovery] to what discovery would take

place in collateral proceedings . . . ," Aug. 1 Tr. at 7:7-8 (Court).  Folse confirmed the Court's

summary.  See Aug. 1 Tr. at 7:9 (Sanchez).  Folse admits that he cannot identify a Brady violation.

See Aug. 1 Tr. at 14:25-15:2 (Sanchez).  Folse cites United States v. Velarde, because, "at the time

---

[5]The Court's citations to the transcript of the hearing refer to the court reporter's original,
unedited version.  Any final transcript may contain slightly different page and/or line numbers.

Velarde came forward with [his] request[,] he didn't have a <u>Brady</u> claim . . . [and] couldn't meet the requirements for showing a new trial." Aug. 1 Tr. at 15:20-23 (Sanchez).

The Court inquired how Folse would write the opinion to allow his discovery request and for Folse's ideas on the standard for allowing post-trial discovery. <u>See</u> Aug. 1 Tr. at 7:17-23 (Court); <u>id</u>. at 7:25-8:4 (Court). Folse replied that the United States Court of Appeals for the Tenth Circuit did not clarify a standard, but that Folse's request for discovery would be allowed pretrial. <u>See</u> Aug. 1 Tr. at 8:5-18 (Sanchez). The Court pursued the questioning, inquiring, hypothetically, whether a newspaper article mentioning the Chavez Aff. would be sufficient for a subpoena in pretrial discovery. <u>See</u> Aug. 1 Tr. at 8:19-20:2 (Court). Folse agreed that the information that might be obtained after such an article, while potentially not exculpatory, would be "essential to the preparation of the defense." Aug. 1 Tr. at 9:11-12 (Sanchez). <u>See</u> Aug. 1 Tr. at 9:5-18 (Court, Sanchez). In response to the Court's inquiry, <u>see</u> Aug. 1 Tr. at 9:19-25 (Court), Folse expanded on the evidence's import, explaining that Sanchez' and Clipp's lapel videos are suspicious, because they include video segments from throughout the day, even though Sanchez and Clipp testified that the lapel cameras' batteries died. <u>See</u> Aug. 1 Tr. at 10:1-21 (Sanchez). Further, Folse maintains that he cannot determine from the lapel videos produced before trial whether APD altered the lapel videos. <u>See</u> Aug. 1 Tr. at 11:13-20 (Sanchez). Folse explains that, given the problems with the lapel videos, the Chavez Aff. troubled him further, because it suggested that APD encouraged officers to alter lapel videos and to cover such alterations by blaming lapel cameras' malfunctions, as Sanchez and Clipp did. <u>See</u> Aug. 1 Tr. at 12:10-13:11 (Sanchez).

The Court asked about APD's response to Folse's Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), request for documents related to Sanchez' and Clipp's lapel videos. <u>See</u> Aug. 1

Tr. at 16:6-8 (Court). Folse explained that APD replied to the request by stating that materials had been redacted or were within exceptions to FOIA requests, but, according to Folse, Chavez explained that such explanations were APD's routine excuses for withholding information. See Aug. 1 Tr. at 16:12-23 (Sanchez); id. at 17:1-17:14 (Sanchez). Folse noted that the Elijah[6] investigation, see Elijah Report, filed June 24, 2017 (Doc. 239-1), revealed that APD could modify its lapel camera videos. See Aug. 1 Tr. at 20:23-21:11 (Sanchez).

The Court asked what next steps Folse requested from the Court, because the Court likely would not grant a new trial or find a Brady violation. See Aug. 1 Tr. at 18:11-14 (Court). Folse requested a subpoena to obtain the information that he previously requested from APD. See Aug. 1 Tr. at 18:15-19 (Sanchez).

The United States summarized the hearing, explaining that Folse's argument reveal that he cannot seek a new trial, or allege a Brady, United States v. Trombetta, or United States v. Youngblood violation, and that Folse seeks only post-trial discovery. See Aug. 1 Tr. at 22:10-15 (Mysliwiec). The United States noted that it wants to cross-examine Chavez to illustrate that his claims are not true. See Aug. 1 Tr. at 23:6-10 (Mysliwiec). The United States confirmed, in response to the Court's question, that the Department of Justice is investigating Chavez' allegations, but the United States could not reveal information learned from the investigations. See Aug. 1 Tr. at 23:18-24:4 (Court, Mysliwiec). The Court summarized that the United States might welcome an evidentiary hearing, and the Court noted that it was "in a little bit of a difficult position" having the United States investigating APD and denying Folse a subpoena against APD.

_____

[6]Elijah is a company providing computer forensics services. See Elijah, https://www.elijaht.com/ (last visited Nov. 16, 2018).

Aug. 1 Tr. at 25:20-21 (Court). <u>See</u> <u>id.</u> at 25:14-26:1 (Court). The United States responded that, before granting a subpoena, the Court should allow the parties to question Chavez. <u>See</u> Tr. at 26:4-10 (Mysliwiec); <u>id.</u> at 27:15-25 (Mysliwiec).

The Court asked whether the Chavez Aff. had "more punch," because law enforcement officers would struggle to maintain their positions if they lost their credibility. Aug. 1 Tr. at 28:15 (Court). <u>See</u> Aug. 1 Tr. at 28:6-17 (Court). The United States responded that Folse had cross-examined Sanchez and Clipp at trial. <u>See</u> Aug. 1 Tr. at 28:18-25 (Mysliwiec). The Court agreed, but indicated that a defense lawyer might not have contemplated the issues which the Chavez Aff. raises. <u>See</u> Aug. 1 Tr. at 29:12-17 (Court). The United States clarified that the facts that raised Folse's suspicions about the lapel cameras existed before trial and that Folse could have pursued them further at trial. <u>See</u> Aug. 1 Tr. at 30:18-20 (Mysliwiec). The United States confirmed that it knew no more about the videos than Folse. <u>See</u> Aug. 1 Tr. at 32:7-15 (Court, Mysliwiec, Hurtado). According to the United States, the Elijah Report suggests that APD may have altered the lapel videos before releasing them to the United States. <u>See</u> Aug. 1 Tr. at 33:2-23 (Mysliwiec).

The United States, in response to the Court's questioning, <u>see</u> Aug. 1 Tr. at 34:23-35:3 (Court), clarified that, if Chavez' testimony reveals that his allegations rest on personal knowledge, the United States will approach that situation differently than it approaches the current situation. <u>See</u> Aug. 1 Tr. at 35:4-11 (Mysliwiec). The United States agreed that, if Chavez' testimony supports Folse's arguments, the United States would support a subpoena. <u>See</u> Aug. 1 Tr. at 41:24-42:14 (Mysliwiec). The Court asked, if the Court subpoenaed APD, whether the United States would prefer to review the documents before Folse did so. <u>See</u> Aug. 1 Tr. at 40:6-14 (Court). The

United States responded that such an approach would leave Folse in a difficult position. See Aug. 1 Tr. at 40:15-18 (Mysliwiec).

According to the United States, the proper forum before which Folse should resolve doubts about APD's FOIA response is a state court. See Aug. 1 Tr. at 39:15-40:5 (Mysliwiec). Folse indicated that subpoenaing APD would save the Court and the parties time and resources. See Aug. 1 Tr. at 43:10-20 (Sanchez). Folse further explained that, if APD produced only the documents that he already possessed, he would not take further steps to investigate the matter, but he did not oppose having an evidentiary hearing if the Court thought that doing so was more appropriate than subpoenaing APD. See Aug. 1 Tr. at 44:18-45:6 (Sanchez).

The Court orally ordered to continue the hearing and asked Folse to prepare a subpoena for Chavez. See Aug. 1 Tr. at 48:4-11 (Court). The United States requested a hearing subpoena. See Aug. 1 Tr. at 48:20-22 (Mysliwiec). The Court indicated that, if Chavez' testimony adhered to the statements in his affidavit, the Court would issue the subpoena that Folse requested. See Aug. 1 Tr. at 49:6-11 (Court).

## 5. The September 18, 2017, Hearing.

The Court continued the hearing on September 18, 2017. See Transcript of Hearing at 1, (taken September 18, 2017), filed October 4, 2017 (Doc. 246)("Sept. 18 Tr."). Folse brought Chavez before the Court to testify about APD's lapel cameras, although Folse admitted that Chavez had no personal knowledge about Folse's case. See Sept. 18 Tr. at 4:3-5 (Sanchez). Folse summarized that Sanchez and Clipp were the detectives who followed Folse most closely, and that no extant lapel video records them observing and following Folse, because both Sanchez' and Clipp's lapel cameras' batteries died during their encounter with him. See Sept. 18 Tr. at 5:1-6:1

(Sanchez). Folse noted that, at the time of trial, he did not suspect that APD tampered with the cameras. See Sept. 18 Tr. at 6:7-15 (Sanchez).

Chavez stated that he works at the Department of Energy, Los Alamos Laboratory, in Los Alamos, New Mexico, as a Training Specialist. See Sept. 18 Tr. at 8:19-21 (Chavez); id. at 8:23 (Chavez). He explained that he has an associate's degree in material science, "through DOE Sandia," Sept. 18 Tr. at 11:4 (Chavez); a bachelor's degree in business, from the Anderson School of Management at the University of New Mexico ("UNM"); and a master of business association in human resources, also from the Anderson School of Management at UNM. See Sept. 18 Tr. at 9:2-9 (Chavez). According to Chavez, he also has post-graduate work in management information systems, which is a database-oriented specialty. See Sept. 18 Tr. at 9:10-14 (Chavez). Chavez indicated that APD employed him from June, 2011, to April, 2015. See Sept. 18 Tr. at 9:14-22 (Chavez). He explained that, in 2011, he returned to APD as the Central Records Supervisor, handling records requests from people outside APD, then moved to the IPRA manager position, in which he inspected records that the public requested. See Sept. 18 Tr. at 13:4-23 (Chavez, Sanchez). Chavez testified that, in the latter position, he reviewed lapel camera videos. See Sept. 18 Tr. at 14:16-21 (Sanchez, Chavez). Chavez admitted that he has no training in analyzing videos and that other reasons, besides altering videos, exist for blurry videos. See Sept. 18 Tr. at 99:7-11 (Mysliwiec, Chavez); id. at 101:2-8 (Mysliwiec, Chavez). Chavez stated he based his review of the videos mentioned in the Chavez Aff. on his best judgment after reviewing between "easily over 1,000, maybe 2,000" lapel camera videos throughout his career. Sept. 18 Tr. at 122:12-23 (Sanchez, Chavez).

According to Chavez, APD was using lapel cameras by 2011.  See Sept. 18 Tr. at 17:4-5 (Chavez).  Chavez stated that, by 2015, when the encounter with Folse occurred, some agents used Scorpion, a lapel camera brand, lapel cameras, and some used Taser, another lapel camera brand, lapel cameras.  See Sept. 18 Tr.  at 18:9-20 (Chavez).  As Chavez explained, with the Scorpion lapel cameras, which Sanchez and Clipp used, lapel videos saved to SD cards[7], devices which store the lapel video and from which officers upload the lapel videos to computers, chooses lapel video portions to keep or delete, and send lapel videos to the evidence unit.  See Sept. 18 Tr. at 18:21-20:18 (Sanchez, Chavez).  Chavez qualified that, with the Scorpion lapel cameras, an officer could not alter a lapel video, but a forensic detective could do so.  See Sept. 18 Tr. at 21:2-11 (Chavez).  Chavez clarified that, because the SD cards did not go through his office, he did not see officers altering them, but he knew about one instance, involving a video from an officer undercover at a protest, in which the APD Deputy Chief, Robert Huntsman, refused to reveal a lapel video to the media.  See Sept. 18 Tr. at 21:18-24 (Chavez); id. at 22:6-21 (Chavez).

Chavez explained that, during the height in police shootings, Chavez received complaints from the public that APD had encrypted lapel videos, see Sept. 18 Tr. at 23:21-24:8 (Chavez), and that he heard individuals in APD discussing "bleaching," deleting information from, SD cards, Tr. at 24:10 (Sanchez).  See Sept. 18 Tr. at 24:13-15 (Chavez); id. at 24:18-22 (Chavez).  According to Chavez, he heard comments about bleaching SD cards in the Evidence Unit, generally in relation

_____

[7]An SD card, or secure digital card, "is a non-volatile memory card," an electronic device used for storing and retrieving digital data without powering off the device.  Secure Digital, Wikipedia, https://en.wikipedia.org/wiki/Secure_Digital. See Secure Digital, supra; Non-Volatile, Wikipedia, https://en.wikipedia.org/wiki/Non-volatile_memory; Flash Memory, Wikipedia, https://en.wikipedia.org/wiki/Flash_memory.  SD cards meet standards developed by the SD Association.    See Secure Digital, supra; SD Association, Wikipedia, https://en.wikipedia.org/wiki/SD_Association.

to high profile cases.  See Sept. 18 Tr. at 127:10-16 (Sanchez, Chavez).  In response to Folse's question about SD cards being "deleted, encrypted, altered, or destroyed," Sept. 18 Tr. at 26:13-17 (Sanchez), Chavez expanded on his explanation, stating that only the forensics detectives could encrypt the lapel videos, and that he sometimes talked to technicians who explained that lapel video files were empty, unable to be opened, replaced, or lost, see Sept. 18 Tr. at 26:18-27:7 (Chavez).  Chavez told the Court that, during the height of public information requests, Chavez knew of several lapel videos that neither he nor the requester could open, see Sept. 18 Tr. at 29:24-30:5 (Chavez), which would happen if the lapel video had been encrypted, see Sept. 18 Tr. at 30:11-14 (Chavez).  Chavez clarified that if an individual encrypts a video, no one can access the video unless an original exists.  See Sept. 18 Tr. at 119:8-11 (Sanchez, Chavez).

According to Chavez, through the website Evidence.com, to which APD could upload evidence to build cases' portfolios, see Sept. 18 Tr. at 28:14-24 (Chavez), an officer can alter a lapel video from a Scorpion lapel camera, although altering Taser lapel videos is easier, see Sept. 18 Tr. at 29:14-19 (Chavez).  As Chavez explained, a trail in the audit log and the actual trail[8] could reveal whether someone had encrypted a lapel video.  See Sept. 18 Tr. at 29:5-31:13 (Sanchez, Chavez).  Chavez explained that, as he became more familiar with the system, he began to notice "more deletions, extractions, people looking at certain files.  And this was starting to grow exponentially."  Sept. 18 Tr. at 33:14-20 (Chavez).  Chavez clarified that some of the activity which he observed might have resulted from people looking at lapel videos or practicing with the computer system, and that more people had been granted administrator access to the computer

---

[8]The trails are "chronological record[s] of system activities."  See Audit Trail, Wikipedia, https://en.wikipedia.org/wiki/Audit_trail.

system.  See Sept. 18 Tr. at 34:1-9 (Chavez).  He stated that he had been informed that APD was trying to train more people on the computer system, but Chavez did not find the excuse satisfying.  See Sept. 18 Tr. at 35:1-18 (Sanchez, Chavez).

According to Chavez, "the head of Major Gangs, the Major Crimes Unit," Lieutenant Elizabeth Thompson, told him that officers had been advised not to write reports, which were binding legal documents, until after their lapel camera videos had been reviewed.  Sept. 18 Tr. at 36:9-37:15 (Chavez, Sanchez); id. at 37:11 (Chavez).  According to Chavez, Thompson told him that, if an officer did not plan to include a lapel video, they should not mention the video and state simply that the lapel camera had malfunctioned, died, or had a similar problem.  See Sept. 18 Tr. at 38:8-18 (Chavez).  Regarding officers' statements about problematic videos, Chavez remembered Thompson informing him only that she wanted officers to go to "command staff" before writing the report.  Sept. 18 Tr. at 95:2-16 (Mysliwiec, Chavez).  Chavez confirmed that a common response was that a lapel camera battery had died, see Sept. 18 Tr. at 38:19-39:24 (Sanchez, Chavez), and that the Scorpion lapel cameras had less battery life than the newer Taser lapel cameras, see Sept. 18 Tr. at 39:9-12 (Chavez).

According to Chavez, APD trained individuals to "blur or obstruct" videos with images of, for instance, child minors or considerable gore.  Sept. 18 Tr. at 41:1-2 (Chavez).  See Sept. 18 Tr. at 40:19-41:4 (Chavez).  Chavez confirmed that, toward the end of his career, he saw more videos that looked like someone had altered them.  See Sept. 18 Tr. at 41:13-42:6 (Chavez).  Chavez explained that, at one point, Bill Slausson, the head of the IPRA Unit and Executive Director of Records at the time, told Chavez to keep a presentation "short and sweet," because Slausson wanted to get rid of the IPRA Unit.  Sept. 18 Tr. at 42:25 (Chavez).  See Sept. 18 Tr. at 42:16-43:3

(Chavez).  According to Chavez, APD began to receive more lawsuits about the lapel videos and chose not to release some documents related to the lapel videos.  See Sept. 18 Tr. at 43:7-44:8 (Chavez).

Chavez testified that he had not deleted lapel videos or heard from the Deputy City Attorney, Kathy Levy, that she would delete videos, but that Huntsman had stated that he could make the lapel video from a protest "go away."  Sept. 18 Tr. at 63:22 (Chavez).  See Sept. 18 Tr. at 62:16-25 (Chavez); id. at 63:16-22 (Chavez).  Chavez explained that Detective Frank Pezzano at the Forensic Unit on North Second had destroyed a lapel video or, at least, produced a lapel video that requesters could not open, although Pezzano did not tell Chavez this fact and Chavez did not observe the deletion.  See Sept. 18 Tr. at 66:4-67:4 (Chavez); id. at 67:10-25 (Mysliwiec, Chavez).  Two APD supervisors informed Chavez that Pezzano destroyed lapel videos.  See Sept. 18 Tr. at 69:2-21 (Chavez).  Chavez admitted that he did not know whether Pezzano encrypted video.  See Sept. 18 Tr. at 92:15-18 (Mysliwiec, Chavez).  Chavez testified that he is not aware of anyone, outside those named in the Chavez Aff., who destroyed lapel videos.  See Sept. 18 Tr. at 70:25-71:15 (Chavez).  Chavez has no personal knowledge of Lieutenant Fernando Aragon agreeing to or knowing about lapel videos' deletions.  See Sept. 18 Tr. at 85:8-22 (Mysliwiec, Chavez).  Chavez stated that he based his allegations against Aragon on that Chavez would explain his concerns about lapel videos to Aragon; the problems with the lapel videos would continue; and Chavez could not follow-up with Aragon.  See Sept. 18 Tr. at 85:18-86:7 (Mysliwiec, Chavez).  Chavez had no personal knowledge of officers "bleaching" SD cards.  Sept. 18 Tr. at 87:19-24 (Mysliwiec, Chavez).  Chavez conceded that he did not see anyone alter videos.  See Sept. 18 Tr.

at 89:7-11 (Mysliwiec, Chavez).  Chavez also conceded that he did not have examples of the APD deleting video.  See Sept. 18 Tr. at 106:20-24 (Mysliwiec, Chavez).

At the time corresponding to the events in Folse's case, Chavez was on administrative leave from APD.  See Sept. 18 Tr. at 47:4-11 (Sanchez, Chavez).  Chavez admitted that, aside from what he observed on television, he has no personal knowledge about Folse's case, see Sept. 18 Tr. at 47:12-15 (Chavez), but that, during his administrative leave, his concerns about APD's lapel videos heightened as his personal concerns combined with the conflicting statements that APD made to the media about lapel videos being altered or deleted, see Sept. 18 Tr. at 47:20-48:18 (Sanchez, Chavez).  Chavez stated that he could not tell the Court and the parties whether Sanchez' and Clipp's lapel videos from the encounter with Folse had been edited, but that, when Chavez left the APD, officers, rather than altering problematic lapel videos, stated that no lapel video existed. See Sept. 18 Tr. at 53:1-24 (Sanchez, Chavez).  Chavez admitted that he did not consider Folse's case to be high profile and that he did not know whether anyone had tampered with the lapel videos involving the encounter with Folse.  See Sept. 18 Tr. at 58:17-22; id. at 58:23-59:2 (Chavez). Chavez told the parties and the Court that, because the Department of Justice prosecuted Folse's case, the case might be higher profile.  See Sept. 18 Tr. at 129:9-15 (Chavez).  Chavez agreed with the United States that he would believe a Scorpion lapel video to be accurate, because the Scorpion lapel videos are harder to edit than the Taser lapel videos.  See Sept. 18 Tr. at 60:24-61:7 (Mysliwiec, Chavez).  APD terminated Chavez' employment after he returned from administrative leave, allegedly because he harassed temporary employees.  See Sept. 18 Tr. at 45:2-4 (Chavez); id. at 45:7-9 (Chavez).

Chavez, in response to questions about FOIA requests for lapel videos, explained that, to obtain a lapel video that was not uploaded to APD's online database, a person might need to request a specific lapel video. See Sept. 18 Tr. at 129:23-130:16 (Sanchez, Chavez). Chavez explained that, with the original lapel video files, someone could get a sense of whether parts of a lapel video had been deleted. See Sept. 18 Tr. at 132:1-17 (Sanchez, Chavez). Chavez testified that it would be odd to have lapel video from morning, mid-day, and evening, because the cameras had twelve-hour battery lives. See Sept. 18 Tr. at 134:5-17 (Sanchez, Chavez).

Folse conceded that the United States' cross-examination revealed that Chavez lacked personal knowledge about the statements in his affidavit, see Sept. 18 Tr. at 142:23-143:2 (Sanchez), but Folse stated that he continued to believe that the Court should allow Folse to continue discovery, under the authority of United States v. Velarde, see Sept. 18 Tr. at 143:7-14 (Sanchez). Following Chavez' testimony, Folse argued that the Court and the parties still did not know why the lapel video evidence relevant to Folse's case is missing, and Chavez' testimony about Scorpion lapel cameras' battery life conflicts with Sanchez' and Clipp's explanations about their lapel cameras' batteries dying. See Sept. 18 Tr. at 141:12-142:3 (Sanchez). Further, Folse emphasized that the videos could be manipulated, and the Department of Justice's involvement could make Folse's case sufficiently high profile to merit modifying the lapel videos. See Sept. 18 Tr. at 142:4-18 (Sanchez). Folse concluded that he could now seek a subpoena about the lapel cameras and SD cards. See Sept. 18 Tr. at 143:24-144:2.

The Court asked whether Folse could have subpoenaed the information about Sanchez' and Clipp's lapel videos before trial and whether anything had changed since trial. See Sept. 18 Tr. at 145:5-14 (Court). Folse answered that, at the time of trial, he did not believe the lapel videos

were subject to manipulation.  See Sept. 18 Tr. at 145:15-25 (Sanchez).  The Court persisted that the same evidentiary gap about the lapel videos existed before trial, and Folse could have pursued it then.  See Sept. 18 Tr. at 146:13-19 (Court).  Folse admitted that, while the gap had not changed, his reasons to seek the information had changed.  See Sept. 18 Tr. at 146:20-22 (Sanchez).

The United States requested that the Court deny Folse's requests for a judgment of acquittal, new trial, or post-trial discovery.  See Sept. 18 Tr. at 151:14-17 (Mysliwiec).  According to the United States, Chavez' testimony reveals that he has no personal knowledge about the allegations in his affidavit.  See Sept. 18 Tr. at 148:5-150:3 (Mysliwiec).  The Court asked, see Sept. 18 Tr. at 151:18-24 (Court), and the United States confirmed, that, while doubts about Sanchez' and Clipp's lapel videos existed before Chavez testified, at the hearing's conclusion, the United States believed that no further discovery was necessary and that United States v. Velarde did not apply, see Sept. 18 Tr. at 152:2-153:15 (Mysliwiec).

The Court summarized its belief that, while the Chavez Aff. raised concerns about new evidence, Chavez' testimony alleviated those doubts, and Folse covered the evidentiary gaps related to Sanchez' and Clipp's lapel videos in his cross-examination at trial.  See Sept. 18 Tr. at 156:9-157:10 (Court).  The Court indicated that it would deny Folse's motions for a new trial and for further discovery.  See Sept. 18 Tr. at 157:11-20 (Court).

## LAW REGARDING MOTIONS FOR A NEW TRIAL

The Federal Rules of Civil Procedure and case law governs motions for new trial.  "A motion for a new trial is not regarded with favor and should only be granted with great caution." United States v. Sinclair, 109 F.3d at 1531 (citing United States v. Chatman, 994 F.2d 1510, 1518 (10th Cir. 1997)).  Rule 33 of the Federal Rules of Criminal Procedure provides:

**(a)**     **Defendant's Motion.**  Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires.  If the case was tried without a jury, the court may take additional testimony and enter a new judgment.

**(b)**     **Time to File.**

    **(1)**     **Newly Discovered Evidence.**  Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty.  If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case.

    **(2)**     **Other Grounds.**  Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 7 days after the verdict or finding of guilty.

Fed. R. Crim. P. 33 (bolded in original).  Any motion for a new trial grounded on newly discovered evidence is timely if filed within three years after the verdict.  <u>See</u> Fed. R. Crim. P. 33(b)(1).  Under rule 33, the district court has discretion to grant a new trial if the interests of justice require one. <u>See</u> Fed. R. Crim. P. 33(a).

**1.**     <u>**Motion for a New Trial Based on Alleged** **United States v. Sinclair** **Claims**</u>**.**

Rule 33 permits a defendant to move for a new trial in the event of newly discovered evidence so long as that motion is presented within three years of the verdict of guilt.  <u>See</u> Fed. R. Crim. P. 33(b)(1).  Ordinarily, a defendant seeking a new trial under rule 33(b)(1) must satisfy a five-part test for newly discovered evidence that the Tenth Circuit outlined in <u>United States v. Sinclair</u>.  <u>See</u> 109 F.3d at 1531.  When a rule 33 movant presents such evidence, the court must determine whether he or she has met a five-part test; specifically, the defendant must show that:

(1) the evidence was discovered after trial; (2) the failure to learn of the evidence was not caused by his own lack of diligence; (3) the new evidence is not merely impeaching; (4) the new evidence is material to the principal issues involved; and (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal.

United States v. Sinclair, 109 F.3d at 1531 (internal quotations omitted)(quoting United States v. Stevens, 978 F.2d 565, 570 (10th Cir. 1992). See United States v. Quintanilla, 193 F.3d 1139, 1147 (10th Cir. 1999)(discussing the rule 33 test that United States v. Sinclair, 109 F.3d at 1531 states).

**LAW REGARDING THE UNITED STATES' DUTY TO
DISCLOSE IN CRIMINAL CASES**

The United States' duty to disclose in criminal cases arises from at least three sources: (i) rule 16 of the Federal Rules of Criminal Procedure; (ii) the Due Process Clause of the Fifth Amendment to the Constitution of the United States; and (iii) the Jencks Act, 18 U.S.C. § 3500. Put roughly, rule 16 requires the United States to disclose items material to the defense, items it intends to use in its case-in-chief, and items it obtained from the defendant. See Fed. R. Crim. P. 16. The Due Process Clause requires the United States to furnish information in its possession that is favorable to the accused. Finally, the Jencks Act requires the United States to disclose statements that its witnesses made if those statements are in the United States' possession and relate to those witnesses' trial testimony, after those witnesses have testified at trial.

**1.     Rule 16.**

Rule 16 of the Federal Rules of Criminal Procedure provides:

Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:

    (i)      the item is material to preparing the defense;

    (ii)     the government intends to use the item in its case-in-chief at trial; or

    (iii)    the item was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16(a)(1)(E). Criminal defendants may not, however, embark on a "broad or blind fishing expedition among documents possessed by the Government." Jencks v. United States, 353 U.S. 657, 667 (1957)(quoting Gordon v. United States, 344 U.S. 414, 419 (1953)). Rule 16(a)(2) provides, in part, that rule 16 "does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case." Fed. R. Crim. P. 16(a)(2). The Supreme Court of the United States has interpreted the term "defense" in this statute as referring to "an argument in response to the prosecution's case in chief." United States v. Armstrong, 517 U.S. 456, 462 (1996)("[W]e conclude that in the context of Rule 16 'the defendant's defense' means the defendant's response to the Government's case in chief."). Additionally, rule 16 does not require the United States to produce "reports, memoranda, or other internal government documents . . . [or] statements made by prospective government witnesses except as provided in 18 U.S.C. § 3500." Fed. R. Crim. P. 16 (a)(2).

  2. **Due Process Clause.**

"The Due Process Clause of the Constitution requires the United States to disclose information favorable to the accused that is material to either guilt or to punishment." United States v. Padilla, No. CR 09-3598 JB, 2011 WL 1103876, at *5 (D.N.M. 2011)(Browning, J.). In Brady, the Supreme Court explained that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87. In Giglio v. United States, 405 U.S. 150 (1972)("Giglio") the Supreme Court extended the prosecution's disclosure obligation to evidence that is useful to the defense in impeaching

government witnesses, even if the evidence is not inherently exculpatory. See Giglio, 405 U.S. at 153; United States v. Torres, 569 F.3d 1277, 1282 (10th Cir. 2009)("Impeachment evidence is considered exculpatory for Brady purposes."); Douglas v. Workman, 560 F.3d 1156, 1172-73 (10th Cir. 2009)("[N]o distinction is recognized between evidence that exculpates a defendant and 'evidence that the defense might have used to impeach the [United States'] witnesses by showing bias and interest.'" (quoting United States v. Bagley, 473 U.S. 667, 676 (1985))); United States v. Abello-Silva, 948 F.2d 1168, 1179 (10th Cir. 1991)("Impeachment evidence merits the same constitutional treatment as exculpatory evidence."). Finally, the Supreme Court has refined Brady and clarified that it is not necessary that a defendant request exculpatory evidence: "[R]egardless of request, favorable evidence is material, and constitutional error results from its suppression by the government 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Kyles v. Whitley, 514 U.S. 419, 433 (1995)(quoting United States v. Bagley, 473 U.S. at 682). See Douglas v. Workman, 560 F.3d at 1172 ("The government's obligation to disclose exculpatory evidence does not turn on an accused's request."); United States v. Summers, 414 F.3d 1287, 1304 (10th Cir. 2005)("[T]he prosecution has an affirmative duty to disclose exculpatory evidence clearly supporting a claim of innocence even without request."). "[T]he Due Process Clause does not require the government to disclose before trial the names of its witnesses, just so the defense can have sufficient time to investigate their backgrounds for impeachment information." United States v. Ashley, 274 F. App'x 693, 697 (10th Cir. 2008)(unpublished).[9] See Weatherford v. Bursey, 429 U.S. 545, 559

---

[9] United States v. Ashley is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their

(1977)("It does not follow from the prohibition against concealing evidence favorable to the accused that the prosecution must reveal before trial the names of all witnesses who will testify unfavorably."); United States v. Harmon, 871 F. Supp. 2d. 1125, 1149 (D.N.M. 2012)(Browning, J.).

a.    **Timing of the Disclosure.**

The prosecution's obligation to disclose evidence under Brady can vary depending on the phase of the criminal proceedings and the evidence at issue.  As a general matter, "[s]ome limitation on disclosure delay is necessary to protect the principles articulated in Brady . . . ." United States v. Burke, 571 F.3d 1048, 1054 (10th Cir. 2009).  The Tenth Circuit has recognized that "[i]t would eviscerate the purpose of the Brady rule and encourage gamesmanship were we to allow the government to postpone disclosures to the last minute, during trial."  United States v. Burke, 571 F.3d at 1054.  "[T]he belated disclosure of impeachment or exculpatory information favorable to the accused violates due process when an 'earlier disclosure would have created a reasonable doubt of guilt.'"  United States v. Burke, 571 F.3d at 1054 (quoting United States v. Young, 45 F.3d 1405, 1408 (10th Cir. 1995)).  The Tenth Circuit has stated:

> Where the district court concludes that the government was dilatory in its compliance with Brady, to the prejudice of the defendant, the district court has

persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . .  And we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court finds that United States v. Ashley has persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

discretion to determine an appropriate remedy, whether it be exclusion of the witness, limitations on the scope of permitted testimony, instructions to the jury, or even mistrial.

United States v. Burke, 571 F.3d at 1054. On the other hand, "not every delay in disclosure of Brady material is necessarily prejudicial to the defense." United States v. Burke, 571 F.3d at 1056. "To justify imposition of a remedy, the defense must articulate to the district court the reasons why the delay should be regarded as materially prejudicial." United States v. Burke, 571 F.3d at 1056. Courts should, "[w]hen assessing the materiality of Giglio information, . . . consider the significance of the suppressed evidence in relation to the entire record." United States v. Gonzalez-Montoya, 161 F.3d 643, 650 (10th Cir. 1998).

When a prosecutor's obligations under Brady are triggered, however, they "continue[] throughout the judicial process." Douglas v. Workman, 560 F.3d at 1173. For instance, the obligation to disclose material under Brady can arise during trial. See United States v. Headman, 594 F.3d 1179, 1183 (10th Cir. 2010)("Although Brady claims typically arise from nondisclosure of facts that occurred before trial, they can be based on nondisclosure of favorable evidence (such as impeachment evidence) that is unavailable to the government until trial is underway."). Additionally, the disclosure obligation continues even while a case is on direct appeal. See United States v. Headman, 594 F.3d at 1183; Smith v. Roberts, 115 F.3d 818, 819-820 (10th Cir. 1997)(applying Brady to an allegation that the prosecutor failed to disclose evidence received after trial but while the case was on direct appeal); United States v. Harry, No. CR 10-1915 JB, 2013 WL 684671, at *5 (D.N.M. Feb. 6, 2013)(Browning, J.).

### b.  Material Exculpatory Evidence.

The holding in Brady requires disclosure only of evidence that is both favorable to the accused, and "material either to guilt or to punishment." 373 U.S. at 87. "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. at 682. See United States v. Allen, 603 F.3d 1202, 1215 (10th Cir. 2010). A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. at 682 (internal quotation marks omitted). The Tenth Circuit has noted that "[t]he mere possibility that evidence is exculpatory does not satisfy the constitutional materiality standard." United States v. Fleming, 19 F.3d 1325, 1331 (10th Cir. 1994). The Tenth Circuit has also found that "[d]uplicative impeachment evidence is not material." Douglas v. Workman, 560 F.3d at 1173. "To be material under Brady, undisclosed information or evidence acquired through that information must be admissible." Banks v. Reynolds, 54 F.3d 1508, 1521 n.34 (10th Cir. 1995)(quoting United States v. Kennedy, 890 F.2d 1056, 1059 (9th Cir. 1989)). See United States v. Hykes, No. CR 15-4299 JB, 2016 WL 1730125, at *20 (D.N.M. April 11, 2016)(Browning, J.)(requiring the United States to search police personnel files where "officers' involvement in several excessive-force lawsuits, discrepancies between the officers' story and eyewitnesses' stories, and evidence that the officers had a personal feud with" the defendant suggested that the files contained impeachment evidence).

The burden is on the United States to produce exculpatory materials; the burden is not on the defendant to first note that such materials exist. See Kyles v. Whitley, 514 U.S. at 437 (stating that the prosecution has an affirmative duty to disclose evidence, because "the prosecution, which

alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached"); United States v. Deutsch, 475 F.2d 55, 57 (5th Cir. 1973)(granting a mistrial for failure to produce personnel files of government witnesses), overruled on other grounds by United States v. Henry, 749 F.2d 203 (5th Cir. 1984); United States v. Padilla, 2011 WL 1103876, at *6. The United States' good or bad faith is irrelevant. See Brady, 373 U.S. at 87; United States v. Quintana, 673 F.2d 296, 299 (10th Cir. 1982)("Under Brady, the good or bad faith of government agents is irrelevant."). "This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence." Kyles v. Whitley, 514 U.S. at 439. The United States has an obligation to "volunteer exculpatory evidence never requested, or requested only in a general way," although the obligation exists only "when suppression of the evidence would be of sufficient significance to result in the denial of the defendant's right to a fair trial." Kyles v. Whitley, 514 U.S. at 433 (internal quotation marks omitted). On the other hand, "[t]he Constitution, as interpreted in Brady, does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant." Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d 801, 823 (10th Cir. 1995). Additionally, "[t]he constitution does not grant criminal defendants the right to embark on a broad or blind fishing expedition among documents possessed by the" United States. United States v. Mayes, 917 F.2d 457, 461 (10th Cir. 1990)(quoting Jencks v. United States, 353 U.S. at 667); United States v. Harry, 2013 WL 684671, at *8.

### c.    Evidence Must Be in the United States' Possession.

"It is well settled that there is no 'affirmative duty upon the government to take action to discover information which it does not possess.'"  United States v. Tierney, 947 F.2d 854, 864 (8th Cir. 1991)(quoting United States v. Beaver, 524 F.2d 963, 966 (5th Cir. 1975)).  Accord United States v. Kraemer, 810 F.2d 173, 178 (8th Cir. 1987)(explaining that the prosecution is not required "to search out exculpatory evidence for the defendant"); United States v. Badonie, No. CR 03-2062, 2005 WL 2312480, at *3 (D.N.M. Aug. 29, 2005)(Browning, J.).  On the other hand, "a prosecutor's office cannot get around Brady by keeping itself in ignorance, or by compartmentalizing information about different aspects of a case." Carey v. Duckworth, 738 F.2d 875, 878 (7th Cir. 1984).  Under Brady, "[a] prosecutor must disclose information of which it has knowledge and access." United States v. Padilla, 2011 WL 1103876, at *7 (citing United States v. Bryan, 868 F.2d 1032, 1037 (9th Cir. 1989)).  "A prosecutor may have a duty to search files maintained by other 'governmental agencies closely aligned with the prosecution' when there is 'some reasonable prospect or notice of finding exculpatory evidence.'" United States v. Padilla, 2011 WL 1103876, at *7 (quoting United States v. Johnson, No. 96-40082-02-SAC, 1997 WL 447681, at *3 (D. Kan. June 9, 1997)(Crow, J.)).  See United States v. Brooks, 966 F.2d 1500, 1503 (D.C. Cir. 1992).  A prosecutor does not have a duty, however, to obtain evidence from third parties.  See United States v. Combs, 267 F.3d 1167, 1173 (10th Cir. 2001)(observing that Brady does not oblige the government to obtain evidence from third parties).  See also United States v. DeLeon, No. CR 15-4268 JB, 2017 WL 2271430, at *50 (D.N.M. Feb. 8, 2017)(Browning, J.)(concluding that where "[t]he New Mexico Corrections Department is jumping at the chance to help the prosecution. . . . the Court can confidently say that the New

Mexico Corrections Department's records, under the unique facts of this case, are under the [Assistant United States Attorney's] control."); United States v. Huerta-Rodriguez, No. CR 09-3206, 2010 WL 3834061, at *4, *10 (D.N.M. Aug. 12, 2010)(Browning, J.)(noting that the United States cannot be compelled to produce the New Mexico State Police officers' personnel files, because the New Mexico State Police, which was not a party to the case, possessed the files, and the United States was able to review the files only at the New Mexico State Police office, and could not remove or photocopy any documents without a subpoena); United States v. Badonie, 2005 WL 2312480, at *3 (denying a motion to compel, because the New Mexico State Police possessed the documents, and the United States did not possess the documents which a defendant sought to be produced, even though the United States "could get the information [Defendant] Badonie seeks merely by requesting them").

3.    **The Jencks Act.**

In Jencks v. United States, the Supreme Court held that a "criminal action must be dismissed when the Government, on the ground of privilege, elects not to comply with an order to produce, for the accused's inspection and for admission in evidence, relevant statements or reports in its possession of government witnesses touching the subject matter of their testimony at trial." 353 U.S. at 672.  In so holding, the Supreme Court recognizes that the

> rationale of the criminal cases is that, since the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense.

353 U.S. at 671.  Congress later codified Jencks v. United States' holding in 18 U.S.C. § 3500. See United States v. Kimoto, 588 F.3d 464, 475 (7th Cir. 2009)(explaining that "the Jencks Act,

18 U.S.C. § 3500[,] . . . was enacted in response to the Supreme Court's holding in Jencks v. United States, 353 U.S. 657 . . . ").

Section 3500 of Title 18 of the United States Code provides:

**(a)** In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

**(b)** After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

18 U.S.C. §§ 3500(a), (b). "The Jencks Act requires the government to disclose to criminal defendants any statement made by a government witness that is 'in the possession of the United States' once that witness has testified." United States v. Lujan, 530 F. Supp. 2d 1224, 1232 (D.N.M. 2008)(Brack, J.)(quoting 18 U.S.C. §§ 3500(a)-(b)). The Jencks Act "manifests the general statutory aim to restrict the use of such statements to impeachment." Palermo v. United States, 360 U.S. 343, 349 (1959). The Jencks Act's purpose is "not only to protect Government files from unwarranted disclosure but also to allow defendants materials usable for the purposes of impeachment." United States v. Smaldone, 544 F.2d 456, 460 (10th Cir. 1976)(citing Palermo v. United States, 360 U.S. at 352). The Jencks Act defines statements specifically:

**(e)** The term "statement," as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means--

**(1)** a written statement made by said witness and signed or otherwise adopted or approved by him;

**(2)** a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

**(3)** a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

18 U.S.C. § 3500(e). The Tenth Circuit has held: "Interview notes could be 'statements' under the [Jencks] Act if they are substantially verbatim." United States v. Smith, 984 F.2d 1084, 1086 (10th Cir. 1993). At least one district court within the Tenth Circuit has distinguished interview notes from reports that "embody only the agent's epitomization, interpretation, or impression of an interview," finding that the latter are not producible under the Jencks Act. United States v. Jackson, 850 F. Supp. 1481, 1508 (D. Kan. 1994)(Crow, J.). In United States v. Lujan, the Honorable Robert C. Brack, United States District Judge for the District of New Mexico, explained that rough interview notes may be discoverable under the Jencks Act when a defendant makes "at least . . . a colorable claim that an investigator's discarded rough notes contained exculpatory evidence not included in any formal interview report provided to the defense." 530 F. Supp. 2d at 1266. Judge Brack went on to hold that, "[b]ecause the contents of rough interview notes may in some cases be subject to disclosure and because the potential impeachment value of the notes may not become evident until trial," the United States must preserve its rough interview notes "made by law enforcement agents during interview of potential witnesses" under 18 U.S.C. § 3500. 530 F. Supp. 2d at 1267. See United States v. Cooper, 283 F. Supp. 2d 1215, 1238 (D. Kan. 2003)(Crow, J.)(noting that rough interview notes may be discoverable under the Jencks Act); United States v. Jackson, 850 F. Supp. at 1508-09 (finding that interview notes may be producible under the Jencks Act).

The defendant bears the initial burden of showing that particular materials qualify under the Jencks Act, but the defendant's burden is not heavy.  See United States v. Smaldone, 544 F.2d at 460 ("[T]he burden is on the defendant to show that particular materials qualify as 'Statements' and that they relate to the subject matter of the testimony of the witness.").  To satisfy this burden, the defendant need not prove that particular materials are within the Jencks Act's scope, as the documents are not in the defendant's possession, but, rather, "must plainly tender to the Court the question of the producibility of the document at a time when it is possible for the Court to order it produced, or to make an appropriate inquiry."  United States v. Smith, 984 F.2d at 1086 (quoting Ogden v. United States, 303 F.2d 724, 733 (9th Cir. 1962)).  The defendant's demand for documents under the Jencks Act must be sufficiently precise for a court to identify the requested statements.  See United States v. Smith, 984 F.2d at 1086.  For example, in United States v. Smith, the Tenth Circuit concluded that a defendant had met his burden and made a prima facie showing that a statement of a witness existed which may be producible under the Jencks Act when a government witness testified during the United States' case-in-chief that a government agent had interviewed her before testifying, and the defense counsel moved for production of the notes.  See 984 F.2d at 1085-86.  Once the defendant makes a prima facie showing that a witness statement exists which may be producible under the Jencks Act, the court should conduct a hearing or in camera review of the statement.  United States v. Smith, 984 F.2d at 1086.

The Court has applied the Jencks Act to Drug Enforcement Agency agents' notes, generated from interviews with defendants, holding that the notes must be disclosed to the defendants after the agents testify at trial.  See United States v. Goxcon-Chagal, No. CR 11-2002, 2012 WL 3249473, at *2, *6 (D.N.M. Aug. 4, 2012)(Browning, J.).  In United States v. Tarango,

760 F. Supp. 2d 1163 (D.N.M. 2009)(Browning, J.), the Court, applying 18 U.S.C. § 3500, held

that the United States must produce FBI agents' reports, after the United States' witnesses testified

at trial, to the extent that those reports contain statements from witnesses who testified at trial.  See

760 F. Supp. 2d at 1164, 1167.  See also United States v. Harry, 2013 WL 684671, at *11.

## LAW REGARDING CALIFORNIA V. TROMBETTA/ARIZONA V. YOUNGBLOOD VIOLATIONS

The Tenth Circuit has held that:

"The Supreme Court's jurisprudence divides cases involving nondisclosure of evidence into two distinct universes.  Brady and its progeny address exculpatory evidence still in the government's possession.  Arizona v. Youngblood . . . and California v. Trombetta . . . govern cases in which the government no longer possesses the disputed evidence."

Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 824 n.34 (internal quotation marks

omitted)(quoting Fero v. Kerby, 39 F.3d 1462, 1472 (10th Cir.)).  Accord United States v. Gomez,

191 F.3d 1214, 1218-19 (10th Cir. 1999).  The remedy provided when the government violates a

defendant's due-process rights under either California v. Trombetta or Arizona v. Youngblood is

severe: "[W]hen evidence has been destroyed in violation of the Constitution, the court must

choose between barring further prosecution or suppressing . . . the State's most probative

evidence."  California v. Trombetta, 467 U.S. at 487.  See United States v. Bohl, 25 F.3d 904, 914

(10th Cir.)("Accordingly, after concluding that there has been a violation of [Arizona

v. ]Youngblood, the decision to either suppress the government's secondary evidence describing

the destroyed material or to dismiss the indictment turns on the prejudice that resulted to the

defendant at trial."); United States v. Fletcher, 801 F.2d 1222, 1225 n.3 (10th Cir. 1986)(remanding

for a hearing on whether the government violated California v. Trombetta, and, if so, whether the

proper remedy would be to suppress evidence derived from the lost or destroyed material, or to dismiss the indictment).

"Under the two-prong <u>Trombetta</u> test, the government violates a defendant's right to due process when: (1) it destroys evidence whose exculpatory significance is 'apparent before' destruction; and (2) the defendant remains unable to 'obtain comparable evidence by other reasonably available means.'" <u>United States v. Bohl</u>, 25 F.3d at 909-10 (quoting <u>California v. Trombetta</u>, 467 U.S. at 489). "To invoke <u>Trombetta</u>, a defendant must demonstrate that the government destroyed evidence possessing an 'apparent' exculpatory value." <u>United States v. Bohl</u>, 25 F.3d at 910 (quoting <u>California v. Trombetta</u>, 467 U.S. at 489). The government commits a constitutional violation when it destroys evidence "that might be expected to play a significant role in the suspect's defense." <u>California v. Trombetta</u>, 467 U.S. at 488-89. "We think the test to be applied in such circumstances is whether defendant demonstrates that the evidence is so material that he could not receive a fair trial without it." <u>United States v. Wilks</u>, 629 F.2d 669, 675 (10th Cir. 1980).[10] In <u>United States v. Wilks</u>, the Tenth Circuit found that lost evidence was not so

---

[10]The Tenth Circuit did not cite to either <u>California v. Trombetta</u> or <u>Arizona v. Youngblood</u> in <u>United States v. Wilks</u>. <u>See</u> <u>United States v. Wilks</u>, 629 F.2d at 671-75. In <u>United States v. Wilks</u>, the Tenth Circuit analyzed whether the United States' loss of a lemonade can that was found in a defendant's cell and contained the heroin for which the defendant was charged violated the defendant's due-process rights. <u>See</u> 629 F.2d at 671-75. The defendant's argument, however, was that "the trial court abused its discretion in refusing to dismiss the case because an item of evidence was lost by the government." 629 F.2d at 674. A trial court may dismiss a case when the government's destruction of evidence violates a defendant's due-process rights under <u>California v. Trombetta</u> or <u>Arizona v. Youngblood</u>. <u>See</u> <u>California v. Trombetta</u>, 467 U.S. at 487 ("[W]hen evidence has been destroyed in violation of the Constitution, the court must choose between barring further prosecution or suppressing . . . the State's most probative evidence."). The defendant, thus, sought a remedy which would be available only under <u>California v. Trombetta</u> or <u>Arizona v. Youngblood</u>, or possibly <u>Brady</u>, which the United States Court of Appeals for the Ninth Circuit -- but not the Tenth -- has held can lead to a dismissal if the violation rises to the level of flagrant prosecutorial misconduct. <u>See</u> <u>United States v. Struckman</u>, 611 F.3d 560, 577 (9th Cir.

material that its loss rendered a defendant's trial unfair, because the evidence "could not prove

defendant's innocence . . . ." 629 F.2d at 675. The defendant was charged with possessing heroin

with an intent to distribute, but the government lost a lemonade can containing the heroin that was

found in the defendant's cell. See 629 F.2d at 672, 675. The defendant asserted that the lemonade

can was the one piece of evidence which could exculpate him, because, if his fingerprints were not

on the can, the government would have no evidence that he possessed the heroin. See 629 F.2d at

674. The Tenth Circuit noted that the absence of the defendant's fingerprints on the lemonade can

would be material to his defense, but disagreed that the loss of the can caused his trial to be unfair,

because the can could not, alone, prove his innocence. See 629 F.2d at 674-75. Another inmate

---

2010)("Nonetheless, our circuit has recognized that dismissal with prejudice may be an appropriate remedy for a Brady . . . violation . . . where prejudice to the defendant results and the prosecutorial misconduct is flagrant."). The Tenth Circuit, in United States v. Wilks, noted that the defendant was not alleging "bad faith or intentional withholding or destruction on the part of the government," and, thus, the defendant's theory was not that the government violated his due-process rights under Arizona v. Youngblood. United States v. Wilks, 629 F.2d at 674. See United States v. Bohl, 25 F.3d at 910 ("The Court in [Arizona v. ]Youngblood extended [California v. ]Trombetta to provide that, if the exculpatory value of the evidence is indeterminate and all that can be confirmed is that the evidence was 'potentially useful' for the defense, then a defendant must show that the government acted in bad faith in destroying the evidence." (quoting Arizona v. Youngblood, 488 U.S. at 58)). The trial court, therefore, could only have dismissed the case if the government's loss of the lemonade can violated the defendant's due-process rights under California v. Trombetta. Additionally, the Tenth Circuit cited to United States v. Agurs, 427 U.S. 97 (1976) when it announced that, when a defendant does not demonstrate that evidence was destroyed intentionally or in bad faith, "the test to be applied in such circumstances is whether defendant demonstrates that the evidence is so material that he could not receive a fair trial without it." United States v. Wilks, 629 F.2d at 674. The Supreme Court applied United States v. Agurs' standard of "constitutional materiality" in California v. Trombetta, indicating that the United States v. Agurs' standard of materiality is applicable when determining whether the government's loss of evidence violates a defendant's due-process rights under California v. Trombetta. California v. Trombetta, 467 U.S. at 488-89 (citing United States v. Agurs, 427 U.S. at 109-10). The Court concludes, thus, that, in United States v. Wilks, the Tenth Circuit was applying California v. Trombetta's test to determine whether the government's loss of the lemonade can violated the defendant's due process rights, even though the Tenth Circuit does not cite to California v. Trombetta in its opinion.

had testified that he placed the can with the heroin in the defendant's cell, but the United States undermined this confession with other evidence. See 629 F.2d at 674. The Tenth Circuit determined that the "absence of Wilks' fingerprints on the can . . . would provide cumulative evidence," given that another inmate confessed to the offense. 629 F.2d at 674-75. Because the lemonade can could not alone prove the defendant's innocence, and would be cumulative to the other inmate's confession, the Tenth Circuit determined that the loss of the lemonade can did not render the defendant's trial unfair and violate his due-process rights. See 629 F.2d at 674-75.

If the exculpatory value of evidence that the United States failed to preserve is "indeterminate," then the defendant must show: (i) that the evidence was "'potentially useful' for the defense"; and (ii) "that the government acted in bad faith in destroying the evidence." United States v. Bohl, 25 F.3d at 910 (quoting Arizona v. Youngblood, 488 U.S. at 58). "Potentially useful evidence" is "evidence of which 'no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.'" United States v. Bohl, 25 F.3d at 910 (emphasis in original)(quoting Arizona v. Youngblood, 488 U.S. at 57). Unlike asserted violations of Brady, for which the prosecutor's state of mind is irrelevant, if a defendant asserts that the prosecution violated his or her due-process rights by failing to preserve potentially exculpatory evidence, the defendant may prevail under Arizona v. Youngblood only if he or she demonstrates that the prosecution's failure to preserve the evidence was done in bad faith. See United States v. Pedraza, 27 F.3d 1515, 1527 (10th Cir. 1994)("[I]f the government destroys or otherwise fails to preserve potentially exculpatory evidence, the defendant bears the burden of demonstrating that the government acted in bad faith in doing so.").

Thus, while the state of mind of the prosecutor is irrelevant to the question under Brady of whether the prosecution failed to disclose material exculpatory evidence,

> "the Due Process Clause requires a different result when we deal with the failure of the State to <u>preserve</u> evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." Arizona v. Youngblood, 488 U.S. 51, 57 . . . (1988)(emphasis added).

Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 824 n.34.

The "inquiry into bad faith 'must necessarily turn on the [government's] knowledge of the exculpatory value of the evidence at the time it was lost or destroyed.'" United States v. Bohl, 25 F.3d at 911 (alterations in original)(quoting Arizona v. Youngblood, 488 U.S. at 56 n.*). "[T]he district court's determination regarding bad faith is a mixed question of fact and law, in which the quintessentially factual question of intent predominates . . . ." United States v. Richard, 969 F.2d 849, 853 (10th Cir. 1992)(internal quotations omitted)(quoting United States v. Raymer, 941 F.2d 1031, 1039 n.4 (10th Cir. 1991). "The mere fact that the government controlled the evidence and failed to preserve it is by itself insufficient to establish bad faith." United States v. Richard, 969 F.2d at 853-54 (citing United States v. Zambrana, 841 F.2d 1320, 1343 (7th Cir. 1988)). "[M]ere negligence on the government's part in failing to preserve such evidence is inadequate for a showing of bad faith." United States v. Bohl, 25 F.3d at 912 (citing Arizona v. Youngblood, 488 U.S. at 58. In determining whether the government failed to preserve evidence in bad faith, the Tenth Circuit first considers whether the government was on notice of the potentially exculpatory evidence, and whether the potential exculpatory value of the evidence is based on more than mere speculation or conjecture. See United States v. Bohl, 25 F.3d at 911 (noting that the government "was explicitly placed on notice that [defendants] Bell and Bohl believed the tower legs were potentially exculpatory," and that the "potentially exculpatory value was not merely conclusory, but instead was backed up with objective, independent evidence giving the government reason to believe that further tests on the legs might lead to exculpatory evidence"). Second, the Tenth

Circuit also looks to whether the government had "possession or the ability to control the disposition" of potentially exculpatory evidence at the time the government is put on notice to its existence. United States v. Bohl, 25 F.3d at 912. Third, the Tenth Circuit weighs whether the evidence "was central to the government's case." United States v. Bohl, 25 F.3d at 912 (noting that, in defense to the charge of conspiring to defraud the United States by failing to conform with construction contracts that required a particular structural composition, "the evidence disposed of here was central to the government's case," and "nothing was more probative on the issue of the steel composition," and, thus, because the evidence was destroyed, the defendants could only "rebut the government's test results . . . [with] a general denial of the allegations and seek to undermine the credibility of the government's chemical analyses of the allegedly nonconforming steel"). Fourth, the Tenth Circuit considers whether the government is able to offer an "innocent explanation for its failure to preserve" potentially exculpatory evidence. United States v. Bohl, 25 F.3d at 912-13 ("[E]ven if the government destroys or facilitates the disposition of evidence knowing of its potentially exculpatory value, there might exist innocent explanations for the government's conduct that are reasonable under the circumstances to negate any inference of bad faith.").

## LAW REGARDING UNITED STATES V. VELARDE

Evidentiary hearings are used "to resolve conflicting evidence." United States v. Velarde, 485 F.3d at 559 (quoting Anderson v. Att'y Gen., 425 F.3d 853, 860 (10th Cir. 2005)). In assessing whether a conflict requiring an evidentiary hearing exists, courts apply "the same standards used to decide a Rule 56 motion for summary judgment.'" United States v. Velarde, 485 F.3d at 559-60 (quoting Anderson v. Att'y Gen., 425 F.3d at 860, and citing Blackledge v. Allison, 431 U.S.

63, 80, 97 (1977)).  Where a district court has a complete record, without evidentiary conflicts, or a motion for a new trial raises legal claims only, a district court is "not required to hold" an evidentiary hearing before resolving a motion for a new trial, United States v. Velarde, 485 F.3d at 559 (internal quotation marks omitted)(quoting United States v. Sutton, 767 F.2d 726, 729 (10th Cir. 1985)).  On the other hand, where evidentiary conflicts exist and "the admissible evidence presented by petitioner, if accepted as true, would warrant relief as a matter of law," a district court is required to hold an evidentiary hearing.  United States v. Velarde, 485 F.3d at 560.  In those uncommon situations in which a party cannot meet the standard for an evidentiary hearing, "a district court has broad discretion to fashion discovery mechanisms suitable" for the case.  United States v. Velarde, 485 F.3d at 560.  "Where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is" entitled to a new trial, "it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." United States v. Velarde, 485 F.3d at 560 (internal quotation marks omitted)(quoting Harris v. Nelson, 394 U.S. 286, 299 (1969), and citing United States v. Wolfson, 413 F.2d 804, 808 (2d Cir. 1969)).

## ANALYSIS

The parties agree that Folse is requesting post-trial discovery and cannot establish a Brady, California v. Trombetta, or Arizona v. Youngblood claim.  See Aug. 1 Tr. at 14:25-15:2 (Sanchez); id. at 15:20-23 (Sanchez); id. at 22:10-15 (Mysliwiec); Sept. 18 Tr. at 143:7-14 (Sanchez).  Folse instead requests additional discovery, citing United States v. Velarde.  See Sept. 18 Tr. at 143:7-14 (Sanchez).  Folse has not shown that he will develop any new evidence, because Chavez' testimony reveals no personal knowledge about individuals at APD altering lapel videos and no

consistent APD practice of modifying lapel videos. Accordingly, Folse does not seek information that he could not have sought before trial. The Court, therefore, will deny Folse's request for additional discovery.

Folse urges the Court to view Chavez' testimony at the September 18, 2017, hearing as revealing new evidence -- the possibility that Sanchez and Clipp misled the Court, and the parties, with stories about lapel camera batteries dying. See Sept. 18 Tr. at 141:12-142:3 (Sanchez); id. at 142:4-18 (Sanchez). Although Folse admits that the testimony does not reflect new evidentiary gaps, Folse wants to depict the testimony as suggesting new reasons to doubt Sanchez' and Clipp's stories and, as supporting Folse's request to employ additional discovery mechanisms, particularly subpoenas, against APD. See Sept. 18 Tr. at 146:20-22 (Sanchez); id. at 143:24-144:2. According to Folse, United States v. Velarde dictates that the Court grant him such post-trial discovery. See Sept. 18 Tr. at 143:7-14 (Sanchez).

Rule 33 of the Federal Rules of Criminal Procedure provides that court grant motions for new trials "if the interest of justice so requires." Fed. R. Crim. P. 33(a). "Where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is" entitled to a new trial, "it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." United States v. Velarde, 485 F.3d at 560 (internal quotation marks omitted)(quoting Harris v. Nelson, 394 U.S. at 299 and citing United States v. Wolfson, 413 F.2d at 808).

In United States v. Velarde, a jury convicted the defendant, Mel Velarde, of sexually abusing a minor. See 485 F.3d at 554. The United States retried Velarde, and during the trial, he argued that the minor fabricated the allegations to retaliate against Velarde for his relations with

the minor's mother.  See 485 F.3d at 554.  Three years later, Velarde sought a new trial, alleging

that he learned from a teacher at the minor's school that, before the new trial, the minor "falsely

accused her school teacher and the school's vice principal of inappropriately touching her."  485

F.3d at 555.  The Tenth Circuit determined that additional discovery was warranted in this "rare"

case, in which "defense counsel explained that further details about [the minor's] accusation and

evidence of its falsity were known only to school officials who . . . would discuss the matter only

if compelled by subpoena power."  485 F.3d at 560-61.  See United States v. Franklin, Nos. 06-

20176-01, 09-2439, 2009 WL 4377860, at *6 (D. Kan. Nov. 23, 2009)(Lungstrum, J.)(denying

motion for new trial based on Brady violation and United States v. Velarde where the defendant

made "only conclusory allegations without factual support").  See also United States v. Munchak,

No. 3:CR-10-75, 2014 WL 3557176, at *4 (M.D. Pa. July 17, 2014)(Caputo, J.)(denying additional

discovery where the defendant sought it "solely for the purpose of uncovering evidence related to

speculative allegations of governmental misconduct unsubstantiated by evidentiary support," as

evidenced by the defendant's admission that, after discovery, he might provide "specific support"

for his argument).[11]

Folse's case is distinguishable from United States v. Velarde.  While, as in United States

v. Velarde, Folse proffered an affidavit containing additional evidence, unlike the defendant in

---

[11]In United States v. Silva-Arzeta, 602 F.3d 1208 (10th Cir. 2010), the Tenth Circuit declined to apply the United States v. Velarde standard where the defendant, Ivan Silva-Arzeta, suggested that "someone had tampered with the evidence between" his original trial and his retrial and, after the retrial, sought additional discovery to reveal such potential tampering.  602 F.3d at 1219.  The Tenth Circuit decided the case on Silva-Arzeta's lack of diligence in pursuing the requested evidence before the jury rendered its verdict.  See 602 F.3d at 1219-20 ("The time for Mr. Silva-Arzeta to seek evidence regarding tampering was before the verdict was rendered. . . .  He could have moved at trial for a continuance, subpoenaed former jurors, or taken other steps to investigate tampering.").

United States v. Velarde, Folse could, and did, through the September, 18, 2017, hearing, gain additional information without a subpoena.  See 485 F.3d at 560-61.  Given the information from that hearing, Folse's search for additional information from APD looks more like "a mere fishing expedition based on the defendant's mere hopes of finding exculpatory evidence" than did Velarde's search.  See 485 F.3d at 561.

Chavez' testimony at the hearing revealed that his allegations against the APD rested on weak evidence and that Folse had limited factual support for seeking a new trial.  Chavez stated that he had no personal knowledge about Sanchez' and Clipp's lapel videos of the interaction with Folse.  See Tr. at 47:12-15 (Chavez).  Further, Chavez admitted that he had no personal knowledge about Pezzano improperly altering lapel videos, see Sept. 18 Tr. at 92:15-18 (Mysliwiec, Chavez), had never modified lapel videos himself, see Sept. 18 Tr. at 89:7-11 (Mysliwiec, Chavez), had never witnessed others at APD doing so, and had no examples of others at APD doing so, see Sept. 18 Tr. at 106:20-24 (Mysliwiec, Chavez); id. at 87:19-24 (Mysliwiec, Chavez).  According to Chavez, he surmised that, from his inability to follow up with one officer about his concerns regarding the lapel videos, officers allowed the modifications made to such videos.  See Sept. 18 Tr. at 85:18-86:7 (Mysliwiec, Chavez).  Chavez similarly lacked personal knowledge to support his allegations about APD concealing lapel videos; Chavez cited, as support for his contentions, two statements in which the speaker made no comment about concealing lapel videos -- Huntsman's comment that he could make a lapel video "go away," Sept. 18 Tr. at 63:22 (Chavez), and Thompson's remark that she wanted officers involved in problematic cases to speak with command staff before writing reports to accompany their lapel videos, see Sept. 18 Tr. at 95:2-16 (Mysliwiec, Chavez).  Chavez' allegations, therefore, rest on little factual support.  While Chavez'

testimony may imply that APD has acted, at times, inappropriately in handling its officers' lapel videos, Folse's evidence is closer to "conclusory allegations without factual support," United States v. Franklin, 2009 WL 4377860, at *6, or "speculative allegations of governmental misconduct," United States v. Munchak, 2014 WL 3557176, at *4, than it is to "specific allegations" establishing Folse's entitlement to a new trial, United States v. Velarde, 485 F.3d at 560.

To meet Brady, California v. Trombetta, or Arizona v. Youngblood's tests, Folse would have to establish that the United States suppressed or destroyed evidence about Sanchez' and Clipp's lapel videos. United States v. Reese, 745 F.3d 1075, 1083 (10th Cir. 2014)("[T]he defendant must prove by a preponderance of the evidence . . . the government suppressed evidence . . . ." (citing United States v. Ford, 550 F.3d 975, 981 (10th Cir. 2008))); United States v. Bohl, 25 F.3d at 910 ("To invoke [California v. ]Trombetta, a defendant must demonstrate that the government destroyed evidence possessing an 'apparent' exculpatory value." (quoting California v. Trombetta, 467 U.S. at 489)); United States v. Bohl, 25 F.3d at 910 (requiring that the defendant invoking Arizona v. Youngblood "show the government acted in bad faith in destroying the evidence"). Folse has produced no evidence showing that he will meet his burden to establish that the United States suppressed or destroyed evidence about the lapel cameras. Although the Chavez Aff. suggests a regular practice of altering lapel videos, see Chavez Aff. ¶¶ 14, 16, at 3; id. ¶ 19, at 4; ¶ 20, at 5; id. ¶ 21, at 5; id. ¶ 22, at 5; id. ¶¶ 28-29, at 6; id. ¶ 30, at 6; id. ¶ 31, at 7; id. ¶ 34, at 7, Chavez' testimony reflects otherwise, see, e.g., Sept. 18 Tr. at 47:12-15 (Chavez); id. at 63:22 (Chavez); id. at 85:18-86:7 (Mysliwiec, Chavez); id. at 87:19-24 (Mysliwiec, Chavez); id. at 89:7-11 (Mysliwiec, Chavez); id. at 92:15-18 (Mysliwiec, Chavez);

id. at 95:2-16 (Mysliwiec, Chavez); id. at 106:20-24 (Mysliwiec, Chavez).  Chavez' testimony, with its lack of concrete evidence, does not convince the Court that Folse will uncover, through a subpoena to APD, evidence "show[ing] reason to believe that [Folse] may, if the facts are fully developed, be able to demonstrate that he is" entitled to a new trial.  United States v. Velarde, 485 F.3d at 560.

Moreover, "[t]he time for [Folse] to seek evidence regarding tampering was before the verdict was rendered."  United States v. Silva-Arzeta, 602 F.3d 1208, 1219 (10th Cir. 2010).  Chavez' testimony reveals that Folse has found no new evidentiary gaps.  The possibility that Sanchez and Clipp lied about their lapel camera videos existed during the trial, and Folse knew about that possibility.  Folse pursued the topic in detail at his trial.  See Oct. 5 Tr. at 112:19-114:3 (Villa, Sanchez); id. at 126:6-23 (Villa, Sanchez); Oct. 6 Tr. at 377:18-378:22 (Villa, Clipp); id. at 464:1-22 (Villa, Clipp).  Before the trial, Folse could have sought to subpoena information from APD about the videos, but he did not do so.  Folse does not seek information that he could not have sought earlier.  "[A]ny evidence he might have acquired after a grant of his posttrial motion could have been obtained before the verdict if he had acted diligently."  United States v. Silva-Arzeta, 602 F.3d at 121.  Accordingly, the Court will deny Folse's request for additional discovery.

**IT IS ORDERED** that Defendant Kevin Folse's Motion for a New Trial, filed June 5, 2017 (Doc. 228), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

John C. Anderson
  United States Attorney
William J. Pflugrath
Samuel A. Hurtado
Paul Mysliwiec
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Gregory M. Acton
Albuquerque, NM

--and--

Timothy Wilson Cornish
Albuquerque, New Mexico

--and--

Sara Nathanson Sanchez
Stelzner, Winter, Warburton, Flores, Sanchez & Dawes P.A.
Albuquerque, New Mexico

    *Attorneys for the Defendant*